JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

**08   CV   0439**

| | |
|---|---|
| JOSEPH V. LA ROCCO, JR., | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| MARSH & MCLENNAN COMPANIES, INC.; | : |
| MARSH INC.; MARSH GLOBAL BROKING | : |
| INC.; MARSH GLOBAL BROKING | : |
| (BERMUDA) LTD; MARSH USA INC. | : |
| SEVERANCE PAY PLAN; MARSH USA INC. | : |
| (AS PLAN ADMINISTRATOR OF THE MARSH | : |
| USA INC. SEVERANCE PAY PLAN); and | : |
| HUMAN RESOURCES DIRECTOR OF NORTH | : |
| AMERICAN OPERATIONS OF MARSH USA | : |
| INC. (AS PLAN ADMINISTRATOR OF THE | : |
| MARSH USA INC. SEVERANCE PAY PLAN); | : |
| | : |
| Defendants. | : |

-------------------------------------------------------x

**COMPLAINT
WITH JURY DEMAND**



Plaintiff Joseph V. LaRocco, Jr., by his attorneys, Liddle & Robinson, L.L.P., alleges as follows:

## THE NATURE OF THE ACTION

1. This is a civil action for damages and remedies brought under: (1) breach of contract; (2) violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*; (3) unjust enrichment; (4) quantum meruit; and (5) promissory estoppel.

## JURISDICTION AND VENUE

2. This Court has subject matter over this action pursuant to 28 U.S.C. § 1331 (federal question); ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a); and principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k).

4.     Venue is proper in this district under 28 U.S.C. § 1391.

## THE PARTIES

5.     Plaintiff, Joseph V. LaRocco Jr. ("LaRocco"), is an individual and resides at 505 South Waiola Avenue LaGrange, Illinois 60525.

6.     Until his termination of employment on February 9, 2005, LaRocco was an employee and Managing Director of Defendant Marsh & McLennan Companies, Inc. and its wholly owned subsidiaries Marsh Inc., Marsh Global Broking Inc., and Marsh Global Broking (Bermuda) Ltd. (collectively referred to as "MMC").

7.     Defendant Marsh & McLennan Companies, Inc. is located at 1166 Avenue of the Americas, New York, New York 10036-2774.

8.     LaRocco was a "participant" in the Defendant Marsh USA Inc. Severance Pay Plan (the "Plan"), within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

9.     The Plan is, and at all times relevant hereto was, an employee benefit plan within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

10.     Defendant Marsh USA Inc. is the Plan Sponsor and Plan Administrator of the Plan.

11.     Defendant Marsh USA Inc. is located at 1166 Avenue of the Americas, New York, New York 10036-2708.

## THE FACTS

12.     LaRocco has been employed in the insurance industry for over 22 years.

13.     LaRocco was employed by MMC and its predecessor firm, Johnson & Higgins, for over 20 years.

14.     LaRocco's career at MMC was marked by success and repeated promotions.

15.     From 1992 until 1995, LaRocco worked in MMC's Stamford, Connecticut office as a Vice President and Casualty Team Leader.

16.     In 1995, MMC promoted LaRocco and transferred him from its Stamford, Connecticut office to its Chicago, Illinois office.

17.     LaRocco's duties as a broker entailed primarily negotiating with insurers over the coverage and pricing they would provide for MMC's clients.

18.     In 1998, LaRocco received his Illinois Property & Casualty Producer's License and was promoted to Senior Vice President.

19.     In 2001, MMC again promoted LaRocco and transferred him to its Bermuda subsidiary, Defendant Marsh Global Broking (Bermuda), Ltd.

20.     LaRocco served as the Casualty Manager and Deputy Office Manager in Bermuda.

21.     In November 2003, MMC promoted LaRocco to the position of Manager Director. The promotion letter states "This achievement recognize[d] [his] outstanding past performance, as well as [his] potential to make an even greater contribution to the firm in the future." The "Managing Director title is recognition for colleagues like yourself who are role models for others within [the] company."

3

22.     Under LaRocco's leadership, Defendant Marsh Global Markets (Bermuda), Ltd.'s revenues grew from $20,040,000.00 in 2001, to $62,730,000.00 in 2003.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

23.     LaRocco was a participant in MMC's 2000 Employee Incentive and Stock Award Plan, a copy of which is attached as Exhibit A.

24.     Pursuant to the 2000 Employee Incentive and Stock Award Plan, MMC awarded LaRocco restricted shares of Stock Bonus Units, restricted shares of Deferred Stock Units, and Nonqualified Stock Options.

## Restricted Shares

25.     On June 27, 2002, pursuant to the 2000 Employee Incentive And Stock Award Plan, MMC awarded LaRocco 1,607 restricted shares of Deferred Stock Units.

26.     A copy of the Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units is attached as Exhibit B.

27.     Section III of The Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units states:

### TERMINATON OF EMPLOYMENT

If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Deferred Stock Units shall be as follows:

D.  By the Company without Cause

If you are terminated by the Company without Cause prior to your Normal Retirement Date, the Deferred Stock Units will vest on a pro rata basis. The portion of the Deferred Stock Units that vest is equal to a fraction, the numerator of which is the number of whole months

from the date of grant to the date of termination, and the denominator of which is the number of whole months from the date of grant to June 27, 2005. For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct on the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or any other crime involving moral turpitude; imprisonment for any crime; or any action likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

28.    As of March 31, 2004, the 1,607 shares of Deferred Stock Units were valued by MMC as being worth $75,027.00.

29.    On February 28, 2003, MMC awarded LaRocco 303 restricted shares of Stock Bonus Units, pursuant to the 2000 Employee Incentive And Stock Award Plan.

30.    Upon information and belief, The Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units is identical in all material respects to the document attached as Exhibit B and states the 303 restricted shares of Stock Bonus Units vest upon the date of a termination without Cause.

31.    As of March 31, 2004, MMC valued the 303 restricted shares of Stock Bonus Units as being worth $12,529.00.

32.    On March 1, 2004, MMC awarded LaRocco 416 restricted shares of Stock Bonus Units, pursuant to the 2000 Employee Incentive And Stock Award Plan.

33.    A copy of the Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units is attached as Exhibit C.

34.     Section IV of The Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units states:

> TERMINATON OF EMPLOYMENT
>
> If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Stock Bonus Units shall be as follows:
>
> D.  By the Company without Cause
>
>> If you are terminated by the Company without Cause, the Stock Bonus Units will vest upon your date of termination.  For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct on the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or any other crime involving moral turpitude; imprisonment for any crime; or any action likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

35.     As of March 31, 2004, MMC valued the 416 restricted shares of Stock Bonus Units as being worth $20,039.00.

36.     **THE MARSH USA INC. SEVERANCE PAY PLAN**

37.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified case or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

38.     A copy of the Plan is attached as Exhibit D.

39.     Defendant Marsh USA Inc. is the Plan Sponsor and Plan Administrator of the Plan.

40.     Defendant Human Resources Director of North American Operations of Marsh USA is the day-to-day administrator of the Plan.

41.     Section 2(a) of the Plan, entitled "Eligibility," provides, in relevant part, that:

> Except as otherwise provided in this Section 2, an employee who is classified and treated by the Company as a salaried employee and is currently employed by the Company in the United States may be eligible for severance benefits under this Plan if the following conditions are met:
>
> (i)     the Company has determined, in its sole discretion, that the employee lacks the job skills required for the job even though the employee is diligently attempting to perform the essential functions of the job but is unable to do so through no fault of his/her own, or the employee has been separated from the Company through no fault of the employee as a result of a restructuring or downsizing program, closing of a facility, reorganization, or because the employee's position has been eliminated; [and]
>
> (ii)    the employee remains in his/her position in good standing, in the sole discretion of the Company, until the last day of employment with the Company as designated by the Company ("Termination Date")[.]

See Exhibit D.

42.     Section 2(b)(iii) of the Plan, entitled "Exclusions," provides, in relevant part, that "An individual is not eligible for benefits under this Plan if … his/her termination is for cause." See Exhibit D.

43.     Section 3(b)(i) of the Plan provides, in relevant part, that "Managing Directors eligible for Enhanced Severance Pay will receive one (1) year's Base Salary." See Exhibit D.

## THE MARSH INCENTIVE COMPENSATION PLAN

44.     At the time of LaRocco's employment, MMC had a compensation plan entitled the Marsh Incentive Compensation Plan ("ICP"). The ICP was designed to reward employees

whose individual performance had a positive impact on the firm's performance.  Further, the size of the bonus MMC paid under the ICP related to an employee's level of responsibility at MMC.

45.    According to a document entitled "Marsh Inc. Compensation Philosophy," dated February 20, 2004, the Annual Bonus MMC paid to its employees constituted "the most significant reflection of performance."  A copy of the "Marsh Inc. Compensation Philosophy" is attached as Exhibit E.  At the time of LaRocco's employment, the Annual Bonus MMC paid its employees "reflect[ed] the performance of the Company, the business unit and the individual." See Exhibit E.

46.    Generally, in mid-December, the relevant decision makers at MMC made their bonus recommendations for its employees.

47.    Generally, MMC determined the precise amount it would pay to its employees prior to the end of January and communicated the precise amount to be paid by approximately the third week of January.

48.    MMC paid LaRocco a bonus for 2003 of $90,000.

49.    On November 3, 2003, MMC promoted LaRocco to be a Managing Director.

50.    Based on his higher level of responsibility and continuing outstanding performance, MMC was obligated to pay LaRocco an even bigger bonus for the year 2004.

### Then New York Attorney General Eliot Spitzer's Investigation Into Allegations That MMC Engaged In Bid Rigging

51.    On October 14, 2004, then New York Attorney General Elliot Spitzer publicly announced an investigation into alleged bid rigging by MMC.

52.    On December 14, 2004, Elizabeth Kellner, who worked in MMC's legal department, contacted LaRocco to request that he come to New York City to meet with a representative from Kroll Inc ("Kroll") and an attorney from Davis Polk & Wardell regarding contingent commissions and wholesale commissions.

53.    Kroll, an investigative company, is a wholly owned subsidiary of Defendant Marsh & McLennan Companies, Inc., which was conducting an internal investigation of Elliot Spitzer's allegations.

54.    Kellner advised LaRocco to bring legal counsel to the meeting.

55.    LaRocco promptly traveled to New York, accompanied by counsel.

### MMC Terminated La Rocco, Without Cause

56.    On December 16, 2004, LaRocco participated in a 3-hour interview with the Kroll investigators and MMC's lawyers from Davis Polk & Wardell.

57.    This interview focused upon MMC's allegation that LaRocco's colleagues redacted commission amounts on certain quotes and binders they sent to clients.

58.    In accordance with industry standard and MMC practice, brokers at MMC at one time regularly redacted commission amounts on quotes and binders they sent to clients.

59.    In fact, MMC often maintained two versions of the relevant quotes and binders — one version included the commission amount and the other version contained all of the same information as the first, but did not include the commission amount.

60.    In June 2004, MMC instructed LaRocco to direct his subordinates to stop the practice of redacting commission amounts on quotes and binders they sent to clients.

61.    On or about June 13, 2004, LaRocco sent a memorandum to all of his subordinates to stop the practice of redacting commission amounts on quotes and binders they sent to clients.

62.    At the conclusion of the interview held on December 16, 2004, the lead Kroll investigator informed LaRocco, through his counsel, that MMC was placing him on paid administrative leave, effective immediately.

63.    On February 9, 2005, MMC informed LaRocco that he was terminated "for cause."

64.    At the time MMC terminated LaRocco's employment, his base salary was $186,000.00.

65.    MMC informed LaRocco that because it was terminating his employment "for cause" it was forfeiting his restricted shares of Deferred Stock Units and Stock Bonus Units and that he would not receive a severance payment equal to one-year's base salary.

66.    MMC did not pay LaRocco a bonus for the year 2004.

67.    MMC did not have "cause" to terminate LaRocco's employment.

68.    MMC in fact terminated LaRocco's employment "without cause."

69.    Pursuant to the 2000 Employee Incentive And Stock Award Plan, certain of the unvested restricted shares of Deferred Stock Units and unvested restricted shares of Stock Bonus Units vested upon his termination "without cause."

70.    MMC has not delivered to LaRocco any of the now vested shares.

71.    Because his termination was "without cause," LaRocco is entitled to: (1) restricted shares of Deferred Stock Units and restricted shares of Stock Bonus Units, that vested upon his termination, pursuant to the 2000 Employee Incentive And Stock Award Plan and (2) the severance pay he was entitled to be paid under the Plan.

**Restricted Shares**

72.    Section III of The Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units provided that if MMC terminated LaRocco's employment "without Cause, the [1,607 Restricted Shares of] Deferred Stock Units would vest on a pro rata basis." See Exhibit B.

73.    According to Section III of The Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units, if MMC terminated LaRocco's employment without Cause, "[t]he portion of the Deferred Stock Units that vest is equal to a fraction, the numerator of which is the number of whole months from the date of grant to the date of termination, and the denominator of which is the number of whole months from the date of grant to June 27, 2005." See Exhibit B.

74.    According to the formula set forth in paragraph 27, MMC was obligated to vest 90% of LaRocco's 1,607 shares of Deferred Stock Units, for a total of 1,446 shares.

75.    Upon his termination, MMC failed to vest any portion of LaRocco's Deferred Stock Units.

76.    Upon information and belief, the February 28, 2003 Award of Stock Bonus Units should have vested upon MMC's termination of LaRocco's employment without Cause.

77.    Upon his termination, MMC failed to vest any of the 303 restricted shares of Stock Bonus Units.

78.    Section IV(D) of The Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units provided that if MMC terminated LaRocco's employment "without Cause, the [416 Restricted Shares of] Stock Bonus Units would vest upon his date of termination." See Exhibit C.

79.    Upon his termination, MMC failed to vest any of the 416 restricted shares of Stock Bonus Units.

80.    On or about February 15, 2005, MMC informed the Department of Immigration of Bermuda that it terminated LaRocco for misconduct.

81.    In 2006, LaRocco applied for reinstatement of his Illinois Property & Casualty Producer's License, which had lapsed in April of 2005.

82.    MMC informed the Illinois Department of Financial and Professional Regulation that it terminated LaRocco's employment "for cause."

83.    In August of 2007, after conducting an investigation, the Illinois Department of Financial and Professional Regulation reinstated LaRocco's Illinois insurance license.

## LAROCCO'S CLAIMS

### FIRST CLAIM
(BREACH OF CONTRACT)

84.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 83 above as if specifically set forth herein.

85.    The following constituted express contracts between LaRocco and MMC: (1) the 2000 Employee Incentive and Stock Award Plan (Exhibit A); (2) the Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units (Exhibit B); (3) the Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units; (4) the Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units (Exhibit C); (5) the "Marsh Inc. Compensation Philosophy" (Exhibit E); and (6) the ICP.

86.    LaRocco relied on the: (1) 2000 Employee Incentive and Stock Award Plan (Exhibit A); (2) Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units (Exhibit B); (3) Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units; (4) Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units (Exhibit C); (5) "Marsh Inc. Compensation Philosophy" (Exhibit E); and (6) ICP.

87.    LaRocco performed pursuant to the: (1) 2000 Employee Incentive and Stock Award Plan (Exhibit A); (2) Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units (Exhibit B); (3) Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units; (4) Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units (Exhibit C); (5) "Marsh Inc. Compensation Philosophy" (Exhibit E); and (6) ICP.

88.    MMC owed LaRocco the obligation to vest certain restricted shares of Deferred Stock Units and restricted shares of Stock Bonus Units, pursuant to the terms of the: (1) 2000 Employee Incentive and Stock Award Plan (Exhibit A); (2) Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units (Exhibit B); (3) Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units; and (4) Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units (Exhibit C).

89.    The Plan (Exhibit D) constituted an express contract between Defendants and LaRocco.

90.    LaRocco relied on the Plan (Exhibit D).

91.    LaRocco performed pursuant to the Plan (Exhibit D).

92.    Defendants owed LaRocco the obligation to pay him one year's base salary — $186,000.00 —, pursuant to the Plan (Exhibit D).

93.    MMC owed LaRocco the obligation to pay him a bonus for the year 2004 that "reflect[ed] the performance of the Company, the business unit and [LaRocco]," pursuant to the "Marsh Inc. Compensation Philosophy" (Exhibit E) and the ICP.

94.    By failing to vest and deliver to LaRocco certain restricted shares of Deferred Stock Units and restricted shares of Stock Bonus Units, MMC breached the: (1) 2000 Employee Incentive and Stock Award Plan (Exhibit A); (2) Terms and Conditions for the June 27, 2002 Award of Deferred Stock Units (Exhibit B); (3) Terms and Conditions for the February 28, 2003 Award of Stock Bonus Units; and (4) Terms and Conditions for the March 1, 2004 Award of Stock Bonus Units (Exhibit C).

95.    By failing to pay LaRocco one (1) year's base salary — $186,000.00 —, Defendants breached the Plan (Exhibit D).

96.    By failing to pay LaRocco a bonus for the year 2004 that "reflect[ed] the performance of the Company, the business unit and [LaRocco]," MMC breached the "Marsh Inc. Compensation Philosophy" (Exhibit E) and the ICP.

97.    As a result of Defendants' actions and failure to perform their obligations, LaRocco has suffered damages, including, but not limited to: (1) the vesting and deliverance of certain restricted shares of Deferred Stock Units, restricted shares of Stock Bonus Units, and

Nonqualified Stock Options Awards to which he was entitled; (2) one year's base salary — $186,000.00 —; (3) a bonus for the year 2004 that "reflect[s] the performance of the Company, the business unit and [LaRocco];" and (4) pre-judgment interest and costs.

## SECOND CLAIM
### (VIOLATION OF ERISA § 502(a)(1)(B))

98.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 97 above as if specifically set forth herein.

99.     By their actions, described above, Defendants' refusal to make the severance payment to LaRocco he was owed constituted a wrongful denial of benefits under § 502(a)(1)(B) of ERISA, 29 U.S.C § 1132(a)(1)(B).

100.     Defendants' refusal to make the severance payment to LaRocco he was owed under the Plan was arbitrary and capricious.

101.     As a result of Defendants' actions and failure to perform its obligations, LaRocco has suffered damages, including, but not limited to: (1) one year's base salary — $186,000.00 — and (2) pre-judgment interest, costs, and attorneys' fees.

## THIRD CLAIM
### (UNJUST ENRICHMENT)

102.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 above as if specifically set forth herein.

103.     In the event the Court finds that any of the above Contracts are not valid and enforceable, Defendants are liable to LaRocco under the theory of unjust enrichment.

104.     LaRocco bestowed a benefit on Defendants.

105.     Defendants obtained this benefit without adequately compensating LaRocco.

106.    The circumstances are such that equity and good conscience require Defendants to make restitution to LaRocco.

### FOURTH CLAIM
(QUANTUM MERUIT)

107.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 106 above as if specifically set forth herein.

108.    In the event the Court finds that any of the above Contracts are not valid an enforceable, Defendants are liable to LaRocco under the theory of quantum meruit.

109.    LaRocco performed services in good faith.

110.    Defendants accepted LaRocco's services.

111.    LaRocco expected to be compensated for the services he rendered Defendants.

112.    Defendants owe LaRocco the reasonable value of the services he rendered Defendants.

### FIFTH CLAIM
(PROMISSORY ESTOPPEL)

113.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 112 above as if specifically set forth herein.

114.    Defendants made clear and definite promises to LaRocco, detailed above.

115.    Defendants could reasonably have expected that LaRocco would rely on their promises to his detriment by, among other things, relocating himself and his family to Bermuda.

116.    Defendants breached their promises, as detailed above.

117.    As a direct and proximate result of Defendants' failure to perform their promises, LaRocco has been damaged.

16

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.  On the First Claim for breach of contract, damages in an amount to be determined at trial, but no less than $386,000.00;

B.  On the Second Claim for violation under ERISA, 29 U.S.C § 1132(a)(1)(B), damages in an amount to be determined at trial, but no less than $186,000.00;

C.  On the Third, Fourth, and Fifth Claims, damages in an amount to be determined at trial, but no less than $386,000.00; and

D.  All such other and further relief as the Court deems just and proper, including prejudgment interest, costs, and attorneys' fees pursuant to ERISA.

Dated: New York, New York
       January 16, 2008

LIDDLE & ROBINSON, L.L.P.

By: _____
    Ethan A. Brecher (EB 3425)
    Attorneys for Plaintiff
    800 Third Avenue
    New York, New York 10022
    (212) 687-8500

Exhibit A

MARSH & McLENNAN COMPANIES, INC.

2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

## MARSH & McLENNAN COMPANIES, INC.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

| | | |
|---|---|---|
| 1. | Purposes. | 1 |
| 2. | Definitions. | 1 |
| 3. | Administration. | 3 |
| | (a) Authority of the Committee. | 3 |
| | (b) Manner of Exercise of Committee Authority | 4 |
| | (c) Limitation of Liability. | 5 |
| 4. | Eligibility. | 5 |
| 5. | Stock Subject to the Plan; Adjustments. | 5 |
| | (a) Shares Reserved. | 5 |
| | (b) Manner of Counting Shares. | 6 |
| | (c) Type of Shares Distributable. | 6 |
| | (d) Adjustments. | 6 |
| 6. | Specific Terms of Awards. | 6 |
| | (a) General. | 6 |
| | (b) Options. | 6 |
| | (c) SARs. | 7 |
| | (d) Restricted Stock. | 7 |
| | (e) Deferred Stock Units. | 8 |
| | (f) Stock Bonuses and Stock Awards in Lieu of Cash Awards. | 9 |
| | (g) Dividend Equivalents. | 9 |
| | (h) Other Stock-Based Awards. | 9 |
| | (i) Unit-Based Awards. | 9 |
| 7. | Certain Provisions Applicable to Awards. | 9 |
| | (a) Stand-Alone, Additional, Tandem and Substitute Awards. | 9 |
| | (b) Terms of Awards. | 10 |
| | (c) Form of Payment Under Awards. | 10 |
| | (d) Buyouts. | 10 |
| | (e) Cancellation and Rescission of Awards. | 10 |
| | (f) Awards to Participants Outside the United States. | 10 |
| 8. | Performance Awards. | 10 |

MARSH & McLENNAN COMPANIES, INC.

2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

| | | |
|---|---|---|
| 9. | Change in Control Provisions. | 11 |
| | (a) Acceleration Upon Change in Control. | 11 |
| | (b) "Change in Control" Defined. | 11 |
| | (c) "Change in Control Price" Defined. | 12 |
| | (d) Additional Payments. | 12 |
| | (e) Pooling of Interests. | 13 |
| 10. | General Provisions. | 13 |
| | (a) Compliance with Legal and Exchange Requirements. | 13 |
| | (b) Nontransferability. | 13 |
| | (c) No Right to Continued Employment. | 14 |
| | (d) Taxes. | 14 |
| | (e) Changes to the Plan and Awards. | 14 |
| | (f) No Rights to Awards; No Stockholder Rights. | 14 |
| | (g) Unfunded Status of Awards and Trusts. | 14 |
| | (h) Nonexclusivity of the Plan. | 15 |
| | (i) No Fractional Shares. | 15 |
| | (j) Governing Law. | 15 |
| | (k) Effective Date. | 15 |
| | (l) Titles and Headings; Certain Terms. | 15 |

MARSH & McLENNAN COMPANIES, INC.

## 2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

1.    *Purposes.* The purposes of the 2000 Employee Incentive and Stock Award Plan are to advance the interests of Marsh & McLennan Companies, Inc. and its stockholders by providing a means to attract, retain, and motivate employees of the Company and its Subsidiaries and Affiliates, and to strengthen the mutuality of interest between such employees and the Company's stockholders. This Plan shall be the successor to the Marsh & McLennan Companies, Inc. 1997 Employee Incentive and Stock Award Plan.

2.    *Definitions.* For purposes of the Plan, the following terms shall be defined as set forth below:

(a)    "Affiliate" means any entity other than the Company and its Subsidiaries that is designated by the Committee as a participating employer under the Plan, provided that the Company directly or indirectly owns at least 20% of the combined voting power of all classes of voting stock of such entity or at least 20% of the ownership interests in such entity.

(b)    "Award" means any Option, SAR, Restricted Stock, Deferred Stock Unit, Stock Bonus or Stock Award in Lieu of Cash, Dividend Equivalent, Other Stock-Based Award, or Unit-Based Award, including Performance Awards granted to a Participant under the Plan.

(c)    "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award.

(d)    "Beneficiary" means the person, persons, trust or trusts which have been designated by such Participant in his or her most recent written beneficiary designation filed with the Company to receive the benefits specified under this Plan upon the death of the Participant, or, if there is no designated Beneficiary or surviving designated Beneficiary, then the person, persons, trust or trusts entitled by will or the laws of descent and distribution to receive such benefits.

(e)    "Board" means the Board of Directors of the Company.

(f)    "Change in Control" means Change in Control as defined with related terms in Section 9.

(g)    "Code" means the Internal Revenue Code of 1986, as amended from time to time. References to any provision of the Code shall be deemed to include successor provisions thereto and regulations thereunder.

(h)    "Committee" means the Compensation Committee of the Board, or such other Board committee as may be designated by the Board to administer the Plan. The Committee shall consist solely of two or more directors of the Company.

(i)    "Company" means Marsh & McLennan Companies, Inc., a corporation organized under the laws of the State of Delaware, or any successor corporation.

(j)    "Deferred Stock Unit" means an award, granted to a Participant under Section 6(e), representing the right to receive either Stock or cash or any combination thereof at the end of a specified deferral period.

(k)    "Dividend Equivalent" means a right, granted to a Participant under Section 6(g), to receive cash, Stock, or other property equal in value to dividends paid with respect to a specified number of shares of Stock or to periodic distributions on other specified equity securities of the Company or any Subsidiary or Affiliate. Dividend Equivalents may be awarded on a free-standing basis or in connection with another Award and may be paid currently or on a deferred basis.

(l)    "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time. References to any provision of the Exchange Act shall be deemed to include successor provisions thereto and regulations thereunder.

(m)    "Fair Market Value" means, with respect to Stock, Awards, or other property, the fair market value of such Stock, Awards, or other property determined by such methods or procedures as shall be established from time to time by the Committee. Unless otherwise determined by the Committee in good faith, the Fair Market Value of Stock as of any given date shall mean the per share value of Stock as determined by using the mean between the high and low selling prices of such Stock on the immediately preceding date (or, if the NYSE was not open that day, the next preceding day that the NYSE was open for trading and the Stock was traded) as reported for such date in the table titled "NYSE--Composite Transactions," contained in The Wall Street Journal or an equivalent successor table.

(n)    "Option" means a right, granted to a Participant under Section 6(b), to purchase Stock. No Options will qualify as incentive stock options within the meaning of Section 422 of the Code.

(o)    "Other Stock-Based Award" means a right, granted to a Participant under Section 6(h), that is denominated or payable in, valued in whole or in part by reference to, or otherwise based on, or related to, Stock or other securities of the Company or any Subsidiary or Affiliate, including, without limitation, rights convertible or exchangeable into Stock or such other securities, purchase rights for Stock or such other securities, and Awards with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

(p)    "Participant" means a person who, as an employee of the Company, a Subsidiary or Affiliate, has been granted an Award under the Plan.

(q)    "Performance Award" means an Award of one of the types specified in Section 6 the grant, exercise, or settlement of which is subject to achievement of performance goals and other terms specified under Section 8.

(r)    "Plan" means this 2000 Employee Incentive and Stock Award Plan, as amended from time to time.

- 2 -

(s)    "Preexisting Plan and Share Resolutions" mean the 1997 Employee Incentive and Stock Award Plan and the resolutions adopted by the Board on November 16, 1993 (superseding resolutions adopted on March 17, 1992), as amended and supplemented by resolutions adopted on March 16, 1995 and May 15, 1996, relating to the authorization of two million (2,000,000) shares of Stock for deferred stock units or other compensation purposes.

(t)    "Qualified Member" means a member of the Committee who is a "Non-Employee Director" within the meaning of Rule 16b-3(b)(3).

(u)    "Restricted Stock" means an award of shares of Stock to a Participant under Section 6(d) that may be subject to certain restrictions and to a risk of forfeiture.

(v)    "Rule 16b-3" means Rule 16b-3, as from time to time in effect and applicable to the Plan and Participants, promulgated by the Securities and Exchange Commission under Section 16 of the Exchange Act.

(w)    "Stock" means the Common Stock, $1.00 par value per share, of the Company or such other securities as may be substituted or resubstituted therefor pursuant to Section 5.

(x)    "SAR" or "Stock Appreciation Right" means the right, granted to a Participant under Section 6(c), to be paid an amount measured by the appreciation in the Fair Market Value of Stock from the date of grant to the date of exercise of the right, with payment to be made in cash, Stock, other Awards, or other property as specified in the Award or determined by the Committee.

(y)    "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations (other than the last corporation in the unbroken chain) owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in the chain.

(z)    "Unit-Based Award" means a unit, granted to a Participant under Section 6(i), with value or payment contingent upon performance of the Company, a Subsidiary, or Affiliate, or upon any other factor or performance condition designated by the Committee.

3.    *Administration.*

(a)    *Authority of the Committee.*  The Plan shall be administered by the Committee. The Committee shall have full and final authority to take the following actions, in each case subject to and consistent with the provisions of the Plan:

(i)    to select Participants to whom Awards may be granted;

(ii)    to designate Affiliates;

(iii)    to determine the type or types of Awards to be granted to each Participant;

(iv)    to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate, the terms and conditions of any Award granted under the Plan (including any exercise price, grant price, or purchase price, any restriction or condition, any schedule for lapse of restrictions or conditions relating to transferability or forfeiture, exercisability, or settlement of an Award, and waivers or accelerations thereof, and waivers of performance conditions relating to an Award, based in each case on such considerations as the Committee shall determine), and all other matters to be determined in connection with an Award;

(v)    to determine whether, to what extent, and under what circumstances an Award may be settled, or the exercise price of an Award may be paid, in cash, Stock, other Awards, or other property, or an Award may be canceled, forfeited, exchanged, or surrendered;

(vi)    to determine whether, to what extent, and under what circumstances cash, Stock, other Awards, or other property payable with respect to an Award will be deferred either automatically, at the election of the Committee, or at the election of the Participant, and whether to create trusts and deposit Stock or other property therein;

(vii)    to prescribe the form of each Award Agreement, which need not be identical for each Participant;

(viii)    to adopt, amend, suspend, waive, and rescind such rules and regulations and appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(ix)    to correct any defect or supply any omission or reconcile any inconsistency in the Plan and to construe and interpret the Plan and any Award, rules and regulations, Award Agreement, or other instrument hereunder; and

(x)    to make all other decisions and determinations as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

Other provisions of the Plan notwithstanding, the Board may perform any function of the Committee under the Plan, including for the purpose of ensuring that transactions under the Plan by Participants who are then subject to Section 16 of the Exchange Act in respect of the Company are exempt under Rule 16b-3. In any case in which the Board is performing a function of the Committee under the Plan, each reference to the Committee herein shall be deemed to refer to the Board, except where the context otherwise requires.

(b)    *Manner of Exercise of Committee Authority.* At any time that a member of the Committee is not a Qualified Member, any action of the Committee relating to an Award to be granted to a Participant who is then subject to Section 16 of the Exchange Act in respect of the Company may be taken either (i) by a subcommittee composed solely of two or more Qualified Members, or (ii) by the Committee but with each such member who is not a Qualified Member abstaining or recusing himself or herself from such action, provided that, upon such abstention or recusal, the Committee remains composed solely of two or more Qualified Members. Such

action, authorized by such a subcommittee or by the Committee upon the abstention or recusal of such non-Qualified Member(s), shall be the action of the Committee for purposes of the Plan. Any action of the Committee with respect to the Plan shall be final, conclusive, and binding on all persons, including the Company, Subsidiaries, Affiliates, Participants, any person claiming any rights under the Plan from or through any Participant, and stockholders. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee. The Committee may delegate to officers or managers of the Company or any Subsidiary or Affiliate the authority, subject to such terms as the Committee shall determine, to perform administrative functions and such other functions as the Committee may determine, to the extent permitted under applicable law and, with respect to any Participant who is then subject to Section 16 of the Exchange Act in respect of the Company, to the extent performance of such function will not result in a subsequent transaction failing to be exempt under Rule 16b-3(d).

(c)    *Limitation of Liability.*  Each member of the Committee shall be entitled to, in good faith, rely or act upon any report or other information furnished to him or her by any officer or other employee of the Company or any Subsidiary or Affiliate, the Company's independent certified public accountants, or other professional retained by the Company to assist in the administration of the Plan. No member of the Committee, nor any officer or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination, or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and any officer or employee of the Company acting on their behalf shall, to the fullest extent permitted by law, be fully indemnified and protected by the Company with respect to any such action, determination, or interpretation.

4.    *Eligibility.*  Employees of the Company and Subsidiaries and Affiliates, other than senior executives who are then eligible to be granted awards under the 2000 Senior Executive Incentive and Stock Award Plan or any successor plan thereto, are eligible to be granted Awards under the Plan. In addition, any person who has been offered employment by the Company or a Subsidiary or Affiliate is eligible to be granted Awards under the Plan, provided that such prospective employee may not receive any payment or exercise any right relating to an Award until such person has commenced employment with the Company or a Subsidiary or Affiliate.

5.    *Stock Subject to the Plan; Adjustments.*

(a)    *Shares Reserved.*  Subject to adjustment as hereinafter provided, the total number of shares of Stock reserved for issuance in connection with Awards under the Plan shall be forty million (40,000,000), plus the additional number of shares of Stock specified in the succeeding sentence. There shall be added to the number of shares of Stock reserved for issuance under this Section 5(a) the number of shares authorized and reserved for awards under the Preexisting Plan and Share Resolutions to the extent (A) that such shares were available for grants of awards under the Preexisting Plan and Share Resolutions immediately prior to the Effective Date or (B) that such shares were subject to outstanding awards under the Preexisting Plan and Share Resolutions and thereafter an event occurs or occurred (including expiration or forfeiture) which would result in such shares again being available for Awards under the Plan (as determined pursuant to Section 5(b)). No Award may be granted if the number of shares to which such Award relates, when added to the number of shares previously

- 5 -

issued under the Plan and the number of shares to which other then-outstanding Awards relate, exceeds the number of shares reserved under this Section 5(a). Shares of Stock issued under the Plan shall be counted against this limit in the manner specified in Section 5(b).

(b)     *Manner of Counting Shares.* If any shares subject to an Award or award pursuant to the Preexisting Plan and Share Resolutions are or were forfeited, canceled, exchanged, or surrendered or such Award or award is or was settled in cash or otherwise terminates or was terminated without a distribution of shares to the Participant, including (i) the number of shares withheld in payment of any exercise or purchase price of or tax obligation relating to such an Award or award and (ii) the number of shares equal to the number surrendered in payment of any exercise or purchase price of or tax obligation relating to any Award or award, such number of shares will again be available for Awards under the Plan. The Committee may make determinations and adopt regulations for the counting of shares relating to any Award to ensure appropriate counting, avoid double counting (in the case of tandem or substitute awards), and provide for adjustments in any case in which the number of shares actually distributed differs from the number of shares previously counted in connection with such Award.

(c)     *Type of Shares Distributable.* Any shares of Stock distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued shares or treasury shares, including shares acquired by purchase in the open market or in private transactions.

(d)     *Adjustments.* In the event that any large, special and non-recurring dividend or other distribution (whether in the form of cash or property other than Stock), recapitalization, forward or reverse split, Stock dividend, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the Stock such that an adjustment is determined by the Committee to be appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of (i) the number and kind of shares of Stock which may thereafter be issued in connection with Awards, (ii) the number and kind of shares of Stock issued or issuable in respect of outstanding Awards or, if deemed appropriate, make provisions for payment of cash or other property with respect to any outstanding Award, and (iii) the exercise price, grant price, or purchase price relating to any Award.

6.     *Specific Terms of Awards.*

(a)     *General.* Awards may be granted on the terms and conditions set forth in this Section 6. In addition, the Committee may impose on any Award or the exercise thereof, at the date of grant or thereafter (subject to Section 10(e)), such additional terms and conditions, not inconsistent with the provisions of the Plan, as the Committee shall determine, including terms regarding forfeiture of Awards or continued exercisability of Awards in the event of termination of employment by the Participant.

(b)     *Options.* The Committee is authorized to grant Options to participants on the following terms and conditions:

(i)     Exercise Price. The exercise price per share of Stock purchasable under an Option shall be determined by the Committee; provided, however, that, except as

- 6 -

provided in Section 7(a), such exercise price shall be not less than the Fair Market Value of a share on the date of grant of such Option, and in no event shall the exercise price for the purchase of shares be less than par value.

(ii)    Time and Method of Exercise.  The Committee shall determine at the date of grant or thereafter the time or times at which an Option may be exercised in whole or in part, the methods by which such exercise price may be paid or deemed to be paid, the form of such payment, including cash, Stock, other Awards, shares or units valued by reference to shares issued under any other plan of the Company or a Subsidiary or Affiliate (including shares or units subject to restrictions, so long as an equal number of shares issued upon exercise of the Option are subject to substantially similar restrictions), or notes or other property, and the methods by which Stock will be delivered or deemed to be delivered to Participants (including deferral of delivery of shares under a deferral arrangement).

(c)    SARs.  The Committee is authorized to grant SARs to Participants on the following terms and conditions:

(i)    Right to Payment.  An SAR shall confer on the Participant to whom it is granted a right to receive with respect to each share subject thereto, upon exercise thereof, the excess of (1) the Fair Market Value of one share of Stock on the date of exercise (or, if the Committee shall so determine in the case of any such right, the Fair Market Value of one share at any time during a specified period before or after the date of exercise, or the Change in Control Price as defined in Section 9(c)) over (2) the grant price of the SAR as of the date of grant of the SAR, which shall be not less than the Fair Market Value of one share of Stock on the date of grant of such SAR (or, in the case of an SAR granted in tandem with an Option, shall be equal to the exercise price of the underlying Option).

(ii)    Other Terms.  The Committee shall determine, at the time of grant or thereafter, the time or times at which an SAR may be exercised in whole or in part, the method of exercise, method of settlement, form of consideration payable in settlement, method by which Stock will be delivered or deemed to be delivered to Participants, whether or not an SAR shall be in tandem with any other Award, and any other terms and conditions of any SAR.  An SAR granted in tandem with an Option may be granted at the time of grant of the related Option or at any time thereafter.

(d)    Restricted Stock.  The Committee is authorized to grant Restricted Stock to Participants on the following terms and conditions:

(i)    Issuance and Restrictions.  Restricted Stock shall be subject to such restrictions on transferability and other restrictions, if any, as the Committee may impose at the date of grant or thereafter, which restrictions may lapse separately or in combination at such times, under such circumstances, in such installments, or otherwise, as the Committee may determine.  Except to the extent restricted under the Award Agreement relating to the Restricted Stock, a Participant granted Restricted Stock shall have all of the rights of a stockholder including the right to vote Restricted Stock and the right to receive dividends thereon.

(ii)    Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable restriction period, Restricted Stock, and any accrued but unpaid dividends or Dividend Equivalents, that is or are then subject to a risk of forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents will be waived in whole or in part in the event of terminations resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Restricted Stock and any accrued but unpaid dividends or Dividend Equivalents.

(iii)    Certificates for Stock.  Restricted Stock granted under the Plan may be evidenced in such manner as the Committee shall determine.  If certificates representing Restricted Stock are registered in the name of the Participant, such certificates shall bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Stock, the Company shall retain physical possession of the certificate, and the Company may require the Participant to deliver a stock power, endorsed in blank, relating to the Restricted Stock.

(iv)    Dividends.  Dividends paid on Restricted Stock shall be either paid at the dividend payment date in cash or in shares of unrestricted Stock having a Fair Market Value equal to the amount of such dividends, or the payment of such dividends shall be deferred or the amount or value thereof automatically reinvested in additional Restricted Stock, Deferred Stock Units, other Awards, or other investment vehicles, as the Committee shall determine or permit the Participant to elect.  Stock distributed in connection with a Stock split or Stock dividend, and other property distributed as a dividend, shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Stock with respect to which such Stock or other property has been distributed.

(e)    *Deferred Stock Units.*  The Committee is authorized to grant Deferred Stock Units to Participants, subject to the following terms and conditions:

(i)    Award and Restrictions.  Delivery of Stock or cash, as the case may be, will occur upon expiration of the deferral period specified for Deferred Stock Units by the Committee (or, if permitted by the Committee, as elected by the Participant).  In addition, Deferred Stock Units shall be subject to such restrictions as the Committee may impose, if any, at the date of grant or thereafter, which restrictions may lapse at the expiration of the deferral period or at earlier or later specified times, separately or in combination, in installments or otherwise, as the Committee may determine.

(ii)    Forfeiture.  Upon termination of employment (as determined by the Committee) during the applicable deferral period or portion thereof to which forfeiture conditions apply (as provided in the Award Agreement evidencing the Deferred Stock Units), or upon failure to satisfy any other conditions precedent to the delivery of Stock or cash to which such Deferred Stock Units relate, all Deferred Stock Units, and any accrued but unpaid Dividend Equivalents, that are at that time subject to a risk of

forfeiture shall be forfeited; provided, however, that the Committee may provide, by rule or regulation or in any Award Agreement, or may determine in any individual case, that restrictions or forfeiture conditions relating to Deferred Stock Units and any accrued but unpaid Dividend Equivalents will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part the forfeiture of Deferred Stock Units and any accrued but unpaid Dividend Equivalents.

(f)     *Stock Bonuses and Stock Awards in Lieu of Cash Awards.* The Committee is authorized to grant Stock as a bonus, or to grant other Awards, in lieu of Company commitments to pay cash under other plans or compensatory arrangements. Stock or Awards granted hereunder shall have such other terms as shall be determined by the Committee.

(g)     *Dividend Equivalents.* The Committee is authorized to grant Dividend Equivalents to Participants. The Committee may provide, at the date of grant or thereafter, that Dividend Equivalents shall be paid or distributed when accrued or shall be deemed to have been reinvested in additional Stock, or other investment vehicles as the Committee may specify.

(h)     *Other Stock-Based Awards.* The Committee is authorized, subject to limitations under applicable law, to grant to Participants Other Stock-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan. The Committee shall determine the terms and conditions of such Awards at the date of grant or thereafter. Stock or other securities or property delivered pursuant to an Award in the nature of a purchase right granted under this Section 6(h) shall be purchased for such consideration, paid for at such times, by such methods, and in such forms, including, without limitation, cash, Stock, other Awards, notes or other property, as the Committee shall determine, subject to any required corporate action.

(i)     *Unit-Based Awards.* The Committee is authorized to grant to Participants Unit-Based Awards that are deemed by the Committee to be consistent with the purposes of the Plan. Such Awards may be paid or settled in cash, Stock, other Awards or property.

7.     *Certain Provisions Applicable to Awards.*

(a)     *Stand-Alone, Additional, Tandem and Substitute Awards.* Awards granted under the Plan may, in the discretion of the Committee, be granted either alone or in addition to, in tandem with, or in exchange or substitution for, any other Award granted under the Plan or any award granted under any other plan of the Company, any Subsidiary or Affiliate, or any business entity to be acquired by the Company or a Subsidiary or Affiliate, or any other right of a Participant to receive payment from the Company or any Subsidiary or Affiliate. Awards may be granted in addition to or in tandem with such other Awards or awards may be granted either as of the same time as or a different time from the grant of such other Awards or awards. The per share exercise price of any Option, grant price of any SAR, or purchase price of any other Award conferring a right to purchase Stock which is granted, in connection with the substitution of awards granted under any other plan of the Company or any Subsidiary or Affiliate or any business entity to be acquired by the Company or any Subsidiary or Affiliate, shall be determined by the Committee, in its discretion, and may, to the extent the Committee

determines necessary in order to preserve the value of such other award, be less than the Fair Market Value of a share on the date of grant of such substitute Award.

(b)    *Terms of Awards.*  The term of each Award shall be for such period as may be determined by the Committee.

(c)    *Form of Payment Under Awards.*  Subject to the terms of the Plan and any applicable Award Agreement, payments to be made by the Company or a Subsidiary or Affiliate upon the grant, maturation, or exercise of an Award may be made in such forms as the Committee shall determine at the date of grant or thereafter, including, without limitation, cash, Stock, or other property, and may be made in a single payment or transfer, in installments, or on a deferred basis.  The Committee may make rules relating to installment or deferred payments with respect to Awards, including the rate of interest to be credited with respect to such payments.

(d)    *Buyouts.*  The Committee may at any time offer to buy out any outstanding Award for a payment in cash, Stock, other Awards (subject to Section 7(a)), or other property based on such terms and conditions as the Committee shall determine.

(e)    *Cancellation and Rescission of Awards.*  The Committee may provide in any Award Agreement that, in the event a Participant violates a term of the Award Agreement or other agreement with or policy of the Company or a Subsidiary or Affiliate, takes or omits to take actions that are deemed to be in competition with the Company or its Subsidiaries or Affiliates, an unauthorized solicitation of customers, suppliers, or employees of the Company or its Subsidiaries or Affiliates, or an unauthorized disclosure or misuse of proprietary or confidential information of the Company or its Subsidiaries or Affiliates, or takes or omits to take any other action as may be specified in the Award Agreement, the Participant shall be subject to forfeiture of such Award or portion, if any, of the Award as may then remain outstanding and also to forfeiture of any amounts of cash, Stock, other Awards, or other property received by the Participant upon exercise or settlement of such Award or in connection with such Award during such period (as the Committee may provide in the Award Agreement) prior to the occurrence which gives rise to the forfeiture.

(f)    *Awards to Participants Outside the United States.*  The Committee may modify the terms of any Award under the Plan granted to a Participant who is, at the time of grant or during the term of the Award, resident or primarily employed outside of the United States in any manner deemed by the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then resident or primarily employed, or so that the value and other benefits of the Award to the Participant, as affected by foreign tax laws and other restrictions applicable as a result of the Participant's residence or employment abroad, shall be comparable to the value of such an Award to a Participant who is resident or primarily employed in the United States.  An Award may be modified under this Section 7(f) in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation.

8.    *Performance Awards.*  The right of a Participant to exercise or receive a grant or settlement of any Award, and the timing thereof, may be subject to such performance conditions as may be specified by the Committee.  The Committee may use such business

- 10 -

criteria and other measures of performance as it may deem appropriate in establishing any performance conditions, and may exercise its discretion to reduce or increase the amounts payable under any Award subject to performance conditions. Achievement of performance goals in respect of such Performance Awards shall be measured over a performance period specified by the Committee. Settlement of such Performance Awards shall be in cash, Stock, other Awards, or other property, in the discretion of the Committee. The Committee shall specify the circumstances in which such Performance Awards shall be forfeited in the event of termination of employment by the Participant prior to the end of a performance period or settlement of Performance Awards, and other terms relating to such Performance Awards in accordance with Section 6 and this Section 8.

9.    *Change in Control Provisions.*

(a)    *Acceleration Upon Change in Control.* Except as provided in Section 9(e) or in an Award Agreement, in the event of a "Change in Control," as defined in this Section:

(i)    any Award carrying a right to exercise that was not previously exercisable and vested shall become fully exercisable and vested; and

(ii)    the restrictions, deferral limitations, and forfeiture conditions applicable to any other Award granted under the Plan shall lapse, such Awards shall be deemed fully vested, any performance conditions imposed with respect to Awards shall be deemed to be fully achieved, and payment of such Awards shall be made in accordance with the terms of the Award Agreements.

(b)    *"Change in Control" Defined.* For purposes of the Plan, a "Change in Control" shall have occurred if:

(i)    any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, any trustee or other fiduciary holding securities under an employee benefit plan of the Company or any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company), is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 50% or more of the combined voting power of the Company's then outstanding voting securities;

(ii)    during any period of two consecutive years, individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (i), (iii), or (iv) of this Section 9(b)) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(iii)    the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than (A) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or parent entity) 50% or more of the combined voting power of the voting securities of the Company or such surviving or parent entity outstanding immediately after such merger or consolidation or (B) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no "person" (as hereinabove defined) acquired 50% or more of the combined voting power of the Company's then outstanding securities; or

(iv)    the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets (or any transaction having a similar effect).

(c)    *"Change in Control Price" Defined.*  For purposes of the Plan, "Change in Control Price" means the higher of (i) the highest price per share paid in any transaction constituting a Change in Control or (ii) the highest Fair Market Value per share at any time during the 60-day period preceding or following a Change in Control.

(d)    *Additional Payments.*  If any payment attributable to any Award under the Plan or to any award under the Preexisting Plan and Share Resolutions (the "Payments") will be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code (or any similar tax that may hereafter be imposed), the Company shall pay at the time specified below an additional amount (the "Gross-Up Payment") such that the net amount retained by a Participant after deduction of any Excise Tax on such Payments and any federal, state and local income and employment tax and Excise Tax upon the payment provided for by this Section, shall be equal to the Payments. For purposes of determining whether any of the Payments will be subject to the Excise Tax and the amount of such Excise Tax, (i) all payments or benefits received or to be received by a Participant in connection with a Change in Control of the Company or the Participant's termination of employment with the Company, a parent corporation thereof, a Subsidiary or Affiliate (pursuant to the Plan or any other plan, agreement or arrangement of the Company, its Subsidiaries or Affiliates) shall be treated as "parachute payments" within the meaning of Section 280G(b)(2) of the Code, and all "excess parachute payments" within the meaning of Section 280G(b)(1) shall be treated as subject to the Excise Tax, unless in the opinion of tax counsel selected by the Company's independent auditors and acceptable to the Participant such payments or benefits (in whole or in part) do not constitute parachute payments, or such excess parachute payments (in whole or in part) represent reasonable compensation for services actually rendered within the meaning of Section 280G(b)(4) of the Code in excess of the base amount within the meaning of Section 280G(b)(3) of the Code, or are otherwise not subject to the Excise Tax; (ii) the amount of the Payments which shall be treated as subject to the Excise Tax shall be equal to the lesser of (1) the total amount of the Payments or (2) the amount of excess parachute payments within the meaning of Section 280G(b)(1) (after applying clause (i) above); and (iii) the value of any non-cash benefits or any deferred payment or benefit shall be determined by the Company's independent auditors in accordance with the principles of Sections 280G(d)(3) and (4) of the Code. For purposes of determining the amount of the Gross-Up Payment, the Participant shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up

Payment is to be made and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Participant's residence on the date such Gross-Up Payment is made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes. In the event that the Excise Tax is subsequently determined to be less than the amount taken into account hereunder at the time of the Gross-Up Payment, the Participant shall repay to the Company at the time that the amount of such reduction in Excise Tax is finally determined, the portion of the Gross-Up Payment attributable to such reduction (plus the portion of the Gross-Up Payment attributable to the Excise Tax and federal and state and local income tax imposed on the Gross-Up Payment being repaid by the Participant if such repayment results in a reduction in Excise Tax and/or a federal and state and local income tax deduction) plus interest on the amount of such repayment at the rate provided in Section 1274(b)(2)(B) of the Code. In the event that the Excise Tax is determined to exceed the amount taken into account hereunder at the time of the Gross-Up Payment (including by reason of any payment the existence or amount of which cannot be determined at the time of the Gross-Up Payment), the Company shall make an additional Gross-Up Payment in respect of such excess (plus any interest payable with respect to such excess) at the time that the amount of such excess is finally determined. Any Gross-Up Payment to be made to the Participant under this paragraph shall be payable within thirty (30) days of the date of the Change in Control.

(e)    *Pooling of Interests.*  Notwithstanding the provisions of this Section 9, in the event that consummation of a Change in Control is contingent on the ability to account for such Change in Control under "pooling of interests" accounting methodology, the provisions of Sections 9(a) and 9(d) hereof shall not be implemented to the extent such implementation would prevent the Change in Control transaction from being accounted for in such manner. In such event, the Committee may in its discretion take such action as it deems appropriate, without precluding the Change in Control transaction from being so accounted for, to enable holders of Awards to realize substantially similar economic results as would have been realized through application of Sections 9(a) and 9(d) hereof.

10.    *General Provisions.*

(a)    *Compliance with Legal and Exchange Requirements.*  The Plan, the granting and exercising of Awards thereunder, and the other obligations of the Company under the Plan and any Award Agreement, shall be subject to all applicable federal and state laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required. The Company, in its discretion, may postpone the issuance or delivery of Stock under any Award until completion of such stock exchange listing or registration or qualification of such Stock or other required action under any state, federal or foreign law, rule or regulation as the Company may consider appropriate, and may require any Participant to make such representations and furnish such information as it may consider appropriate in connection with the issuance or delivery of Stock in compliance with applicable laws, rules and regulations.

(b)    *Nontransferability.*  Except as otherwise provided in this Section 10(b), Awards shall not be transferable by a Participant other than by will or the laws of descent and distribution or pursuant to a designation of a Beneficiary, and Awards shall be exercisable during the lifetime of a Participant only by such Participant or his guardian or legal representative. In addition, except as otherwise provided in this Section 10(b), no rights under

the Plan may be pledged, mortgaged, hypothecated, or otherwise encumbered, or subject to the claims of creditors. The foregoing notwithstanding, the Committee may, in its sole discretion, provide that Awards (or rights or interests therein) shall be transferable, including permitting transfers, without consideration, to a Participant's immediate family members (i.e., spouse, children, grandchildren, or siblings, as well as the Participant), to trusts for the benefit of such immediate family members, and to partnerships in which such family members are the only parties, or other transfers deemed by the Committee to be not inconsistent with the purposes of the Plan.

(c)     *No Right to Continued Employment.*  Neither the Plan nor any action taken thereunder shall be construed as giving any employee the right to be retained in the employ of the Company or any of its Subsidiaries or Affiliates, nor shall it interfere in any way with the right of the Company or any of its Subsidiaries or Affiliates to terminate any employee's employment at any time.

(d)     *Taxes.*  The Company or any Subsidiary or Affiliate is authorized to withhold from any Award granted, any payment relating to an Award under the Plan, including from a distribution of Stock, or any payroll or other payment to a Participant, amounts of withholding and other taxes due in connection with any transaction involving an Award, and to take such other action as the Committee may deem advisable to enable the Company and Participants to satisfy obligations for the payment of withholding taxes and other tax obligations relating to any Award. This authority shall include authority to withhold or receive Stock or other property and to make cash payments in respect thereof in satisfaction of a Participant's tax obligations. Other provisions of the Plan notwithstanding, only the minimum amount of Stock deliverable in connection with an Award necessary to satisfy statutory withholding requirements will be withheld.

(e)     *Changes to the Plan and Awards.*  The Board may amend, alter, suspend, discontinue, or terminate the Plan or the Committee's authority to grant Awards under the Plan; provided, however, that, without the consent of an affected Participant, no amendment, alteration, suspension, discontinuation, or termination of the Plan may materially adversely affect the rights of such Participant under any Award theretofore granted to him or her. The Committee may waive any conditions or rights under, or amend, alter, suspend, discontinue, or terminate any Award theretofore granted and any Award Agreement relating thereto; provided, however, that, without the consent of an affected Participant, no such amendment, alteration, suspension, discontinuation, or termination of any Award may materially adversely affect the rights of such Participant under such Award. Following the occurrence of a Change in Control, the Board may not terminate this Plan or amend this Plan with respect to Awards that have already been granted in any manner adverse to employees.

(f)     *No Rights to Awards; No Stockholder Rights.*  No Participant or employee shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Participants and employees. No Award shall confer on any Participant any of the rights of a stockholder of the Company unless and until Stock is duly issued or transferred to the Participant in accordance with the terms of the Award.

(g)     *Unfunded Status of Awards and Trusts.*  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation. With respect to any payments not

yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award shall give any such Participant any rights that are greater than those of a general creditor of the Company; provided, however, that the Committee may authorize the creation of trusts or make other arrangements to meet the Company's obligations under the Plan to deliver cash, Stock, other Awards, or other property pursuant to any Award, which trusts or other arrangements shall be consistent with the "unfunded" status of the Plan unless the Committee otherwise determines. If and to the extent authorized by the Committee, the Company may deposit into such a trust Stock or other assets for delivery to the Participant in satisfaction of the Company's obligations under any Award. If so provided by the Committee, upon such a deposit of Stock or other assets for the benefit of a Participant, there shall be substituted for the rights of the Participant to receive delivery of Stock and other payments under this Plan a right to receive the assets of the trust (to the extent that the deposited Stock or other assets represented the full amount of the Company's obligation under the Award at the date of deposit). The trustee of the trust may be authorized to dispose of trust assets and reinvest the proceeds in alternative investments, subject to such terms and conditions as the Committee may specify and in accordance with applicable law.

(h)    *Nonexclusivity of the Plan.* The adoption of the Plan by the Board shall not be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including the granting of stock options and other awards otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

(i)    *No Fractional Shares.* No fractional shares of Stock shall be issued or delivered pursuant to the Plan or any Award. The Committee shall determine whether cash, other Awards, or other property shall be issued or paid in lieu of such fractional shares or whether such fractional shares or any rights thereto shall be forfeited or otherwise eliminated.

(j)    *Governing Law.* The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan, and any Award Agreement shall be determined in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of laws, and applicable federal law.

(k)    *Effective Date.* The Plan shall become effective upon approval by the Board of Directors (the "Effective Date").

(l)    *Titles and Headings; Certain Terms.* The titles and headings of the sections in the Plan are for convenience of reference only. In the event of any conflict, the text of the Plan, rather than such titles or headings, shall control. The term "including," when used in the Plan, means in each case "including without limitation."

Exhibit B

This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act Of 1933.

MARSH & McLENNAN COMPANIES
2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions for June 27, 2002 Award of Deferred Stock Units

The award of Deferred Stock Units granted on June 27, 2002 under the Marsh & McLennan Companies (the Company) 2000 Employee Incentive and Stock Award Plan (the Plan) is subject to the following terms and conditions:

I.    RIGHTS OF DEFERRED STOCK UNITS

You will receive dividend equivalent payments on the Deferred Stock Units. These payments will be included in your payroll checks. Unless and until both the vesting conditions of the award have been satisfied and you have received the shares of Company common stock in accordance with the terms and conditions described herein, you have none of the attributes of ownership to such shares of stock.

II.   VESTING PERIOD AND RIGHTS

The award is scheduled to vest on the earlier of (1) June 27, 2005 or (2) the later of your Normal or Deferred Retirement Date (as such terms are defined in the Company's primary Retirement Plan applicable to you). Once the award vests and is available for distribution (which will occur within a reasonable time subsequent to the vesting date), you will receive one share of Company common stock for each of your Deferred Stock Units.

III.  TAXES

The tax treatment associated with your award is as follows:

(1)   The value of Deferred Stock Units generally is not taxable at grant.
(2)   The receipt of dividend equivalents is taxable on a current basis as additional compensation.
(3)   At vesting, you will be given further information regarding the tax consequences of your receipt of the shares; at that time, you also will be required to satisfy any payroll tax obligation from the distribution.

## IV. TERMINATION OF EMPLOYMENT

If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Deferred Stock Units shall be as follows:

### A. Death

If you die, the Deferred Stock Units will vest immediately to the person or persons to whom your rights shall pass by will or the laws of descent and distribution.

### B. Permanent Disability

If you become totally and permanently disabled, as determined under the Company's Long-Term Disability Plan applicable to you, the Deferred Stock Units will vest immediately.

### C. Retirement

If you retire on or after your Normal Retirement Date, the Deferred Stock Units will vest when you retire.

### D. By the Company without Cause

If you are terminated by the Company without Cause prior to your Normal Retirement Date, the Deferred Stock Units will vest on a pro rata basis. The portion of the Deferred Stock Units that vest is equal to a fraction, the numerator of which is the number of whole months from the date of grant to the date of termination, and the denominator of which is the number of whole months from the date of grant to June 27, 2005. For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct in the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or of any other crime involving moral turpitude; imprisonment for any crime; or any action likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

### E. All Other Employment Terminations

If you cease to be an active employee of the Company or any of its subsidiaries or affiliates before the end of the vesting period for any reason other than death, permanent disability, or normal or deferred retirement, or termination without Cause, your right to such Deferred Stock Units shall be forfeited, except to the extent that the Compensation Committee of the Company's Board of Directors (the Committee) may determine otherwise.

V.    CHANGE IN CONTROL PROVISIONS

Upon the occurrence of a "change in control" of the Company, as defined in the Plan, or upon sale of the business unit in which you work, sale of a business unit in which you work, any unvested Deferred Stock Units will vest and the shares from the vested award will be delivered to you as soon as practicable thereafter.

VI.    OTHER PROVISIONS

A.    This award of Deferred Stock Units does not give you any right to continue to be employed by the Company or any of its subsidiaries or affiliates, or limit, in any way, the right of your employer to terminate your employment, at any time, for any reason not specifically prohibited by law.

B.    The Company is not liable for the non-issuance or non-transfer, nor for any delay in the issuance or transfer of any shares of common stock due to you upon the vesting of Deferred Stock Units which results from the inability of the Company to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of common stock of the Company, if counsel for the Company deems such authority necessary for the lawful issuance or transfer of any such shares. Your acceptance of this award constitutes your agreement that the shares of common stock subsequently acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

C.    The Deferred Stock Units are subject to these terms and conditions and your acceptance hereof shall constitute your agreement to the administrative regulations of the Committee. In the event of any inconsistency between the award terms and conditions and the provisions of the Plan, the provisions of the Plan shall prevail. You may obtain a copy of the Plan by making a request to the Senior Vice President of Human Resources and Administration of the Company.

D.    The Deferred Stock Units are awarded in accordance with such additional administrative regulations as the Committee may, from time to time, adopt. All decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding.

E.    During your lifetime, no right hereunder related to these Deferred Stock Units shall be transferable except by will or the laws of descent and distribution.

Exhibit C

**This Document Constitutes Part Of A Prospectus Covering Securities That Have Been Registered Under The Securities Act Of 1933.**

MARSH & McLENNAN COMPANIES
2000 EMPLOYEE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions for March 1, 2004 Award of Stock Bonus Units
to U.S. Grant Recipients

The award of Stock Bonus Units granted on March 1, 2004 under the Marsh & McLennan Companies (the "Company") 2000 Employee Incentive and Stock Award Plan (the "Plan") is subject to the following terms and conditions:

## I.    RIGHTS OF STOCK BONUS UNITS

You will receive dividend equivalent payments on the Stock Bonus Units. These payments will be included in your payroll checks. Unless and until both the vesting conditions of the award have been satisfied and you have received the shares of Company common stock in accordance with the terms and conditions described herein, you have none of the attributes of ownership to such shares of stock.

## II.    VESTING PERIOD AND RIGHTS

The award is scheduled to vest on the earlier of (1) March 1, 2007 or (2) the date of your retirement (i.e., your Normal or Deferred Retirement Date or, subject to the provisions of Section IV-D, your Early Retirement Date, as such terms are defined in the Company's primary Retirement Plan applicable to you).  Once the award vests and is available for distribution (which will occur within a reasonable time subsequent to the vesting date), you will receive one share of Company common stock for each of your Stock Bonus Units.

## III.    TAXES

The tax treatment associated with your award is as follows:

(1)    The value of Stock Bonus Units is not taxable at grant.
(2)    The receipt of dividend equivalents is taxable on a current basis as additional compensation.
(3)    Once the award vests and is distributed to you, the distribution will be includable in your taxable income; at that time, an appropriate number of shares will be withheld to satisfy your payroll tax obligation from the distribution.
(4)    For grant recipients who defer their distribution at least three years (or until the year following retirement) and are granted a supplemental award, such individuals will be subject to FICA withholding on the value of the units attributable to the supplement at the date of vesting.

IV.    TERMINATION OF EMPLOYMENT

If your employment with the Company or any of its subsidiaries or affiliates terminates, your right to the Stock Bonus Units shall be as follows:

A.    Death

If you die, the Stock Bonus Units will vest immediately to the person or persons to whom your rights shall pass by will or the laws of descent and distribution.

B.    Permanent Disability

If you become totally and permanently disabled, as determined under the Company's Long-Term Disability Plan applicable to you, the Stock Bonus Units will vest immediately.

C.    Normal or Deferred Retirement

If you retire on or after your Normal Retirement Date, the Stock Bonus Units will vest when you retire.

D.    Early Retirement

If you retire before your Normal Retirement Date, the Stock Bonus Units will vest when you retire, provided that you execute the attached Non-Solicitation Agreement for Early Retirees, and in fact do comply with said Non-Solicitation Agreement for a period commencing with your Early Retirement Date and ending at the earlier of (i) three years thereafter or (ii) March 1, 2007, it being understood that failure to comply with said Non-Solicitation Agreement will cause your early retirement to be governed by the provisions of "F. All Other Employment Terminations", below.

E.    By the Company without Cause

If you are terminated by the Company without Cause, the Stock Bonus Units will vest upon your date of termination. For purposes of these terms and conditions, Cause shall mean misappropriation of assets of the Company or any of its subsidiaries or affiliates; willful misconduct in the performance of the employee's duties; continued failure after notice, or refusal, to perform the duties of the employee; violation of a written code of conduct applicable to the employee; willful violation of an important policy of the Company or any of its subsidiaries or affiliates; breach of fiduciary duty or breach of trust; conviction of a felony, or of any other crime involving moral turpitude; imprisonment for any crime; or any other action likely to bring substantial discredit to the Company or any of its subsidiaries or affiliates.

F.    All Other Employment Terminations

If you cease to be an active employee of the Company or any of its subsidiaries or affiliates before the end of the vesting period for any reason other than death, permanent disability, retirement (exclusive of early retirement if you fail to enter into the Non-Solicitation Agreement for Early Retirees), or termination without Cause, your right to such Stock Bonus Units shall be forfeited, except to the extent that the Compensation Committee of the Company's Board of Directors (the "Committee") may determine otherwise.

## V.    CHANGE IN CONTROL PROVISIONS

### A.    Change in Control

Upon the occurrence of a "change in control" of the Company, as defined in the Plan, or upon the sale of the business unit in which you work, any unvested Stock Bonus Units will vest and the shares from the vested award will be delivered to you as soon as practicable thereafter.

### B.    Additional Payment

Should you receive shares from the vesting of Stock Bonus Units that have been accelerated because of a change in control, all or part of the value (the total market price of the shares on the date of vesting) of those shares (the Accelerated Shares) may be subject to a 20% federal excise tax. The excise tax is imposed when the value of the Accelerated Shares (plus any other payments which are determined to be contingent on a change in control) is more than 2.999 times the average of your last five years W-2 earnings.

If a change in control occurs and you receive Accelerated Shares, the Company will determine if the 20% federal excise tax is payable. If it is payable, the Company will pay to you, within five days of making the computation, an amount of money (the Additional Payment) equal to the excise tax plus additional amounts for federal, state and local taxes so that the excise tax and income taxes on the excise tax payment will not cost you any money. If the Additional Payment is later determined to be less than the amount of taxes you owe, a further payment will be made to you. If the Additional Payment is more than the amount you owe, you will be required to reimburse the Company.

## VI.    OTHER PROVISIONS

### A.    This award of Stock Bonus Units does not give you any right to continue to be employed by the Company or any of its subsidiaries or affiliates, or limit, in any way, the right of your employer to terminate your employment, at any time, for any reason not specifically prohibited by law.

### B.    The Company is not liable for the non-issuance or non-transfer, nor for any delay in the issuance or transfer of any shares of common stock due to you upon the vesting of Stock Bonus Units which results from the inability of the Company to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer shares of common stock of the Company, if counsel for the Company deems such authority necessary for the lawful issuance or transfer of any such shares. Your acceptance of this award constitutes your agreement that the shares of common stock subsequently acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

### C.    The Stock Bonus Units are subject to these terms and conditions and your acceptance hereof shall constitute your agreement to the administrative regulations of the Committee. In the event of any inconsistency between the award terms and conditions and the provisions of the Plan, the provisions of the Plan shall prevail. You may obtain a copy of the Plan by making a request to the Senior Vice President of Human Resources and Administration of the Company.

D.    The Stock Bonus Units are awarded in accordance with such additional administrative regulations as the Committee may, from time to time, adopt. All decisions of the Committee upon any questions arising under the Plan or under these terms and conditions shall be conclusive and binding.

E.    During your lifetime, no right hereunder related to these Stock Bonus Units shall be transferable except by will or the laws of descent and distribution.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the Exchange Act), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting Ms. Kelly Gamble, Manager, Global Compensation at 212/948-3523. She can also be reached via internal electronic mail (Lotus Notes) or the internet at Kelly.gamble@mmc.com.

Exhibit D

# MARSH USA INC. SEVERANCE PAY PLAN

Amended and restated as of July 1, 2002.

## 1. Purpose

This Severance Pay Plan (the "Plan"), as amended and restated, has been adopted by Marsh USA Inc. (the "Company") to provide financial assistance to eligible employees of the Company who are notified of their involuntary termination on or after July 1, 2002 under the circumstances described herein.

This Plan supersedes all previous policies, practices, programs or plans that may have been followed by the Company (or any predecessor, merged or acquired entity) for employees covered by this Plan.

This document constitutes both the plan document and summary plan description required under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). In the event of any conflict between the provisions of this document and any other communication, the provisions of this document will govern.

## 2. Eligibility

### a. In General

Except as otherwise provided in this Section 2, an employee who is classified and treated by the Company as a salaried employee and is currently employed by the Company in the United States may be eligible for severance benefits under this Plan if the following conditions are met:

(i) the Company has determined, in its sole discretion, that the employee lacks the job skills required for the job even though the employee is diligently attempting to perform the essential functions of the job but is unable to do so through

no fault of his/her own, or the employee has been separated from the Company through no fault of the employee as a result of a restructuring or downsizing program, closing of a facility, reorganization, or because the employee's position has been eliminated;

(ii) the employee remains in his/her position in good standing, in the sole discretion of the Company, until the last day of employment with the Company as designated by the Company ("Termination Date"); and

(iii) the employee reconciles his/her expense account, returns any financial advances and Company property, and repays any personal loans on or before his/her Termination Date or the date designated by the Company, whichever is earlier.

b. Exclusions
An individual is not eligible for benefits under this Plan if:

(i) he/she is classified by the Company as an hourly or temporary employee, independent contractor or consultant, agency worker or leased employee; or

(ii) his/her termination is a result of voluntary resignation, retirement or other voluntary termination of employment, failure to return from a vacation or an approved leave of absence, or death; or

(iii) his/her termination is for cause, which, for purposes of this Plan, includes, but is not limited to (whether work-related or not), a termination for: insubordination; dishonesty; theft; willful misconduct; failure to comply with Company policies or guidelines; harassment; fighting or other violent or threatening behavior; excessive absenteeism or tardiness; falsification of records such as employment applications, travel and entertainment records, reports of work hours and client related expenses; commission of an act rising to the level of a crime; or being under the influence of illicit drugs or alcohol at work or on the

Company's premises. In addition, documented poor performance may be considered termination for "cause." Determinations regarding what constitutes "cause" shall be made by the Plan Administrator (or its delegate) in its sole discretion; or

(iv) he/she transfers within the Company or any related company, including a successor to all or a part of the Company (following for example, a sale, divestiture or merger of all or part of the Company's business or assets, acquisition, or any other form of corporate reorganization), whether or not the position is comparable or better; or

(v) the Company obtains a comparable or better position for the employee with an unrelated company, and the employee accepts the position; or

(vi) he/she has been offered a comparable or better position or a reasonable change of work assignment with the Company or any entity related to the Company or its parent company, which is within a 50 mile radius of the location of the previous position, whether or not he/she accepts such position. The conditions in this subparagraph (vi) apply to both active employees and to employees returning from an authorized leave of absence within twelve (12) months after the commencement of such leave. The determination of whether a position is comparable or better or a reasonable change of work assignment, for purposes of this Plan, will be made by the Plan Administrator (or its delegate) in its sole discretion; or

(vii) his/her selection for involuntary termination is revoked by the Company prior to the Termination Date; or

(viii) at the time of his/her selection for involuntary termination, he/she has been out of the office on a leave of absence, whether paid or unpaid, including

a disability leave of absence, for a period of six (6) months or more; or

(ix) he/she commences new employment prior to the Termination Date.

c. In addition, an employee may not be eligible for severance benefits under this Plan if he/she is entitled to severance/notice pay as a matter of law, or is covered by an individual employment agreement or any other contractual arrangement:

(i) providing for continuation of salary and/or other payments or benefits if he/she is terminated before a certain date and/or providing for severance benefits; or

(ii) where the Company would be obligated to continue his/her salary and/or other payments or benefits after his/her termination because of a contractual guarantee; or

(iii) where the employee has executed or entered into a Memorandum of Agreement or other agreement with a company acquired by the Company or by a related company that provides for a termination notice period of greater than fifteen (15) days.

In that case, the employee will be eligible to receive the greater of: (A) the benefits provided for under the employment agreement or other contractual arrangement or the severance/notice pay to be provided as a matter of law; or (B) provided the employee executes a Waiver and Release Agreement in the form and within the time required by the Company, the benefits provided for under this Plan. In no event will an employee be entitled to receive benefits under both the employment agreement, other contractual arrangement, or under law, and this Plan.

3. Severance Benefits

The following severance benefits are provided for under this Plan. If, by virtue of the nature of the employee's termination, he/she is eligible for notice of termination pursuant to the federal Worker Adjustment Retraining &

Notification Act ("WARN") or any similar state or local plant or facility closing law, his/her severance benefits under this Plan shall be reduced by such statutory notice entitlement.

a. Basic Severance Benefit
Except as otherwise provided in this Section 3, an employee who meets the eligibility requirements of Section 2 above ("Plan Participant") will be eligible to receive Basic Severance Pay equal to two (2) weeks' Base Salary (as defined below).

b. Enhanced Severance Benefits
In lieu of the Basic Severance Benefit described above, a Plan Participant who executes and returns a Waiver and Release Agreement in the form and within the time required by the Company, the terms of which are incorporated herein by reference and which may include, without limitation, non-solicitation provisions, will be eligible to receive Enhanced Severance Benefits as follows:

(i) Enhanced Severance Pay
With the exception of Managing Directors, a Plan Participant eligible for Enhanced Severance Pay will receive Enhanced Severance Pay based on the chart below and the Plan Participant's Base Salary, as defined below. In no event, however, will Enhanced Severance Pay exceed one (1) year's Base Salary. Managing Directors eligible for Enhanced Severance Pay will receive one (1) year's Base Salary.

| Title | Enhanced Severance is the greater of: |
|---|---|
| Non-officer | 2 weeks of Base Salary per Year of Service* OR 1 month's Base Salary |
| Assistant Vice President | 2 weeks of Base Salary per Year of Service* OR 3 months' Base Salary |
| Vice President | 2 weeks of Base Salary per Year of Service* OR 6 months' Base Salary |
| Senior Vice President | 2 weeks of Base Salary per Year of Service* OR 9 months' Base Salary |
| Managing Director | 12 months' Base Salary |

*To a maximum of one (1) year's Base Salary.

- For purposes of determining the amount of Basic or Enhanced Severance Pay a Plan Participant is eligible to receive under the terms of this Plan, the term "Base Salary" means such Plan Participant's base salary including any applicable shift differential, but exclusive of overtime compensation, commissions, bonuses, other payments, or any fringe benefits or other forms of remuneration, as in effect on the Plan Participant's Termination Date. Any performance/merit reviews that are pending or in process as of the Termination Date also shall not be taken into account in determining a Plan Participant's Base Salary or the amount of Severance Pay. For a Plan Participant who has switched from part-time to full-time, or vice versa, during the twelve (12) month period preceding his/her Termination Date, his/her Base Salary shall be determined using the weighted average of his/her base salary during such prior twelve (12) month period.

- In addition, for purposes of determining the amount of Enhanced Severance Pay a Plan

Participant is eligible to receive under the terms of this Plan, a Plan Participant will be credited with a Year of Service for each completed twelve (12) month period with the Company or any related company as measured from the Plan Participant's date of hire through the end of any Basic Severance period. Further, if a Plan participant has worked for a partial year of service, he/she will be credited with 1/12 of a Year of Service for each completed month or portion thereof. For rehires or employees with a change in employment status, the start dates of service for purposes of calculating severance will be the benefit vesting date under the general service rules applicable to the Marsh & McLennan Companies, Inc., United States Retirement Program. If applicable, appropriate service will be granted for continuous service with predecessor companies acquired by a Marsh & McLennan company. Notwithstanding the above, in no event will a Plan Participant be credited with Years of Service for any period for which the Plan Participant already received severance pay from the Company, any related company or any predecessor of the Company or related company.

(ii) Outplacement Counseling
A Plan Participant eligible for Enhanced Severance Pay will be eligible to receive, upon request, outplacement benefits at the Company's expense, at a level, for a duration (as set forth below), and by an outplacement Company to be selected by the Plan Administrator. Outplacement counseling must commence no later than sixty (60) days following the Termination Date. If the Plan Participant chooses not to participate in outplacement counseling as offered under this Plan, the Company will not provide the Plan Participant with any additional compensation in lieu thereof.

| Title | Outplacement Benefit |
|---|---|
| Non-Officer | 1-2 Day Program |
| Assistant Vice President or Vice President | 3 Month Program |
| Senior Vice President or Managing Director | 6 Month Program |

**4. Manner Of Payment**

Payment of Basic Severance Pay under this Plan will be made in a lump-sum payment, less applicable withholdings, on or about the 30th calendar day following the Termination Date.

Enhanced Severance Pay payable pursuant to the terms of a signed Waiver and Release Agreement will not be paid until such Agreement is executed, returned to the Company, and becomes effective by its terms. Subject to the foregoing, such Enhanced Severance Pay will be paid in a lump sum, less applicable withholdings, on or about the 30th calendar day following the receipt of the signed Waiver and Release Agreement by the Company.

**5. Payment Offsets**

The Company reserves the right to reduce any severance benefit paid under this Plan to the extent necessary to take into account any of the following: any outstanding financial obligation(s) that the employee has to the Company, including, but not limited to, expense account balances, employee loans, relocation allowances, employee advances (including tuition advances and vacation or sick days taken in advance of their being earned by the employee) and the value of any computer hardware or software, communications equipment or other Company-provided property in the individual's possession that he/she has failed to return to the Company as of the Termination Date or the date designated by the Company, whichever is earlier.

The determination of any such severance benefit reductions will be made by the Plan Administrator (or its delegate) in its sole discretion.

## 6. If An Employee Is Re-Employed By The Company

Any re-employment in any capacity of a terminated employee must be approved by the Human Resources Director, North American Operations, and the Senior Business Manager of the Company. If an employee accepts re-employment with the Company, its parent or any affiliate or subsidiary of the Company, or becomes an independent contractor to or consultant for the Company, its parent or any affiliate or subsidiary of the Company prior to the expiration of the period commensurate with which Enhanced Severance is paid to him/her, he/she may be required to refund all or a pro-rata portion of the Enhanced Severance Pay to the Company as a condition of re-employment (i.e., the amount paid in excess of the actual period of unemployment). Any amount required to be refunded will be determined by the Plan Administrator (or its delegate) in its sole discretion. Should such employment be accepted, and should an employee be required to refund all or a pro-rata portion of such payments to the Company, such circumstances will not affect the validity of the Waiver and Release Agreement previously executed by the employee.

## 7. Effect On Other Benefits

Except as may otherwise be provided under this Plan or under any other applicable Company plan(s), or required by applicable law, all Company-provided benefits will terminate on the Plan Participant's Termination Date.

## 8. Source Of Benefits

Benefits under this Plan will be paid from the general assets of the Company. No assets or funds with respect to any such benefits will be segregated by the Company in any fund, account or trust. A Plan Participant shall

have no greater claim against the assets of the Company than as a general unsecured creditor.

## 9. Administration

The Plan will be administered by the Company. As Plan Administrator, the Company has delegated responsibility for the day-to-day administration of the Plan to the Human Resource Director, North American Operations.

The Company and/or the Human Resources Director, North American Operations, may appoint or employ such persons as either deems necessary to render advice with respect to any responsibility of either under the Plan. Both the Company and the Human Resources Director, North American Operations, may delegate to any one or more of the Company's employees any responsibility it may have under the Plan and may designate any other person or persons to carry out any responsibility of either under the Plan.

Acting on behalf of the Company, the Human Resources Director, North American Operations, shall make the rules and regulations necessary to administer the Plan. The Company and the Human Resources Director, North American Operations, shall have the discretionary authority and responsibility to determine eligibility for benefits and the amount of such benefits, and to construe the terms of the Plan. The determinations and constructions of the Company or the Human Resources Director, North American Operations, as the case may be, will be final, binding and conclusive as to all parties, unless found by a court of competent jurisdiction to be arbitrary and capricious. Any delegation of the Company's or the Human Resources Director, North American Operations, shall carry such discretionary authority as the Company of the Human Resources Director, North American Operations, possesses regarding the matter unless otherwise specified.

Correspondence regarding this Plan should be addressed to:

Marsh USA Inc. Severance Pay Plan
c/o Human Resources Director, North American Operations
Marsh USA Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

## 10. Claims Procedure

An employee who is eligible for benefits under this Plan will be notified and provided with any forms required in connection with receipt of Plan benefits, including if applicable, a Waiver and Release Agreement. If such employee disagrees with the determination of his/her benefits, he/she may, within thirty (30) days of receipt of the initial notification, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits, together with any documents which he/she believes supports his/her claim. Any employee who is not so notified but believes that he/she is entitled to benefits under the Plan may, within thirty (30) days of such employee's Termination Date, submit a written statement to the Plan Administrator describing the basis of his/her claim for benefits and requesting any forms required in connection with payment of such benefits.

If any claim for severance benefits is wholly or partially denied, the Plan Administrator shall notify the claimant within ninety (90) days after the written claims statement is submitted, or within ninety (90) days after any required forms are filed, if later (except that in special circumstances the Plan Administrator may take an additional ninety (90) days to consider its decision, in which case the employee will be notified of the extension). Such notification shall set forth: (1) the specific reasons for the denial (including reference to any pertinent Plan provisions on which the denial is

based); (2) if applicable, a description of any additional material or information necessary for the claimant to perfect the claim, and an explanation of why such material or information is necessary; and (3) the claims review procedure and (4) a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA if the claim is denied following a review on appeal.

Any employee whose claim for benefits under this Plan is denied may make a written request to the Plan Administrator, within sixty (60) days after such denial, for a review of the denial. Any such request must include any evidence relevant to the claim and may include a request for pertinent documents. The employee claiming benefits shall be notified of the final decision of the Plan Administrator within sixty (60) days after his/her request for a review is received. However, if the Plan Administrator finds it necessary to extend this period due to special circumstances and so notifies the claimant in writing, the decision shall be rendered as soon as practicable, but in no event later than one hundred and twenty (120) days after the claimant's request for review. The decision shall be in writing and shall set forth the specific reasons for the denial (including reference to any pertinent Plan provisions on which the denial is based) and a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA.

The Plan Administrator's decision on claims shall be final, binding, and conclusive on all interested persons unless found by a court of competent jurisdiction to be arbitrary and capricious.

11. Amendment Or Termination Of This Plan
The Company, acting through the Human Resources Director, North American Operations, reserves the right, whether in an individual case or more generally, to amend or terminate this Plan, and/or to alter, reduce or eliminate any pay practice, policy or benefit, in whole or

in part, with or without advance notice; provided, however, that no such amendment or termination shall adversely affect the benefits payable with respect to any Plan Participant who has a Termination Date prior to the adoption of such amendment or termination. The Company may award additional benefits, whether on an individual basis or more generally, under this Plan on a discretionary basis.

12. Withholding Of Taxes

The Company will withhold, or cause to have withheld, all applicable income and payroll taxes from any severance pay benefit paid under this Plan to the extent required by law. Federal income taxes will be withheld at the flat tax rate established under the Internal Revenue Code.

13. General Information

The following pages describe other information a Plan Participant should know about the Plan.

Plan Sponsor
    Marsh USA Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

Plan Administrator
    Marsh USA Inc.
    1166 Avenue of the Americas
    New York, New York 10036-2708
    (212) 345-6000

An employee may contact the Plan Administrator by writing to the Human Resources Director, North American Operations, at the above address.

Type of Plan
    The Plan is a severance plan.

**Effective Date**

The Plan was originally effective as of February 1, 2001. This amendment and restatement of the Plan is effective as of July 1, 2002.

**Plan Year**

The Plan's records are kept on a calendar year basis.

**Plan Identification**

The official name of the Plan is the Marsh USA Inc. Severance Pay Plan. The Internal Revenue Service identifies Marsh USA Inc. by the number 36-1438000 and the Department of Labor identifies the Plan by the plan number 501.

**Legal Service**

It is hoped that legal action with regard to the Plan will not be considered necessary. However, if legal action does become necessary, the agent named for service of process is:

Barbara H. Frank, Esq.
Vice President and Counsel
Marsh & McLennan Companies, Inc.
1166 Avenue of the Americas
New York, New York 10036-2708

Additionally, legal service may be served upon the Plan Administrator.

**14. ERISA Rights**

As a participant in the Marsh USA Inc. Severance Pay Plan, an employee is entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ERISA provides that a Plan Participant shall be entitled to:

**Receive Information About the Plan and Benefits**

- Examine without charge, at the Plan Administrator's office and at other specified locations such as worksites, all documents governing the Plan, including insurance contracts

and a copy of the latest annual report (Form 5500 Series), if any, filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration; and

- Obtain upon written request to the Plan Administrator, copies of all documents governing the operation of the Plan, including insurance contracts and copies of the latest annual report (Form 5500 Series), if any, and updated Summary Plan Description. The Plan Administrator may make a reasonable charge for the copies.

**Prudent Action by Plan Fiduciaries**

In addition to creating rights a Plan Participant, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of a Plan Participant and beneficiaries. No one, including an individual's employer, or any other person, may fire an employee or otherwise discriminate against an employee in any way to prevent an employee from obtaining a severance benefit or exercising an employee's rights under ERISA.

**Enforce an Employee's Rights**

If an employee's claim for severance benefits is denied or ignored, in whole or in part, the employee has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps an employee can take to enforce the above rights. For instance, if an employee requests a copy of Plan documents or the latest annual report from the Plan and does not receive them within thirty (30) days, the employee may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay, the

employee up to one hundred and ten dollars ($110) a day until the employee receives the materials, unless the materials were not sent for reasons beyond the control of the Plan Administrator. If an employee has a claim for benefits which is denied or ignored, in whole or in part, the employee may file suit in a state or Federal court. In addition, if an employee disagrees with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, the employee may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if an employee is discriminated against for asserting his/her rights, the employee may seek assistance from the U.S. Department of Labor, or an employee may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If the employee is successful, the court may order the person the employee has sued to pay these costs and fees. If the employee loses, the court may order the employee to pay these costs and fees, for example, if it finds the employee's claim is frivolous.

## Assistance with Questions

If an employee has any questions about the Plan, the employee should contact the Plan Administrator:

Human Resources Director,
North American Operations
Marsh USA Inc.
1166 Avenue of the Americas
New York, New York 10036-2708
(212) 345-6000

If an employee has any questions about this statement or about an employee's rights under ERISA, or if an employee needs assistance in obtaining documents from the Plan Administrator, the employee should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical

Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. An employee may also obtain certain publications about an employee's rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

**Governing Law**
To the extent that this Plan is not governed by federal law, the law of the State of New York shall govern.

Exhibit E

02/20/04

# Marsh Inc.

## Compensation Philosophy

Our objective is to attract, motivate and retain a highly talented mix of insurance brokerage professionals.

### General principles:

1) Total Compensation – the individual pay elements are managed as an integrated whole, without focussing on any one element to the exclusion of the others. Reward and recognition is achieved through the total, not necessarily through each of the components.
2) Pay for performance -- a significant portion of pay is "at risk," tied directly to the performance of the Company, the business unit and the individual. The more responsible the position and/or higher in the organization, the greater the portion of total pay that is at risk.
3) The firm seeks to provide total compensation that is competitive within the insurance brokerage industry and to provide superior earnings opportunities for superior performers.
4) The company provides comprehensive basic core benefits that provide protection against catastrophic losses and opportunities to supplement basic benefits through colleague contributions and provides opportunities for wealth creation through purchase of company stock.
5) For senior executives, Marsh provides equity opportunities intended to align executives' interests with the interests of shareholders.

### Market Competitiveness

1) Base Salary – Marsh seeks to provide base salaries that are competitive within insurance brokerage industry practice.
   Salaries within each position grade are intentionally wide to provide flexibility to accommodate individual situations.
   Salary levels are meant to reflect the skill and experience that colleagues bring to their position.
   Position in range is a function of many factors including: skill level, experience or time in position, performance, and market competitiveness of the job.
2) Annual Bonus – The most significant reflection of performance is the Annual Bonus. Marsh seeks to provide superior incentive opportunities for superior performance. Bonuses are variable and can vary up or down from year to year, reflecting the performance of the Company, the business unit and the individual.
3) Marsh provides a highly competitive benefits package.